UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CITIGROUP GLOBAL MARKETS INC. and CITIGROUP INC., <br><br> Petitioners, <br><br> v. <br><br> JULIA CARREON, <br><br> Respondent. | Civil Action No. 1:26-cv-00194 |

**PETITION TO COMPEL ARBITRATION**

Petitioners Citigroup Global Markets Inc. and Citigroup Inc. (collectively, "Citi" or "Petitioners") hereby petition the Court to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), of the employment claims of Julia Carreon ("Respondent") in accordance with the terms of her binding arbitration agreements with Citi. In support of this Petition, Petitioners allege as follows:

**NATURE OF THE ACTION**

1.    Since Andy Sieg's arrival at Citi in September 2023 as the Head of its Wealth business, he has empowered and championed both female and male leaders, including Respondent, to effectuate meaningful change.

2.    Respondent herself repeatedly emailed Citi Human Resources and Mr. Sieg praising his leadership, including after she voluntarily resigned from Citi to pursue a new venture, stating, among other things, "thank you for recognizing my talent, for putting me in the room, and for treating me with respect. You are truly one of the most exceptional people & leaders I've ever

1

met. Your integrity is irreproachable"; "Andy's leadership is the best thing to happen to this place"; and "Tmrw is my last day. Appreciate you. Can't wait to watch the great things you'll do."

3. Now, Respondent falsely claims that Citi discriminated against her because of her race and gender. Even worse, contrary to her own contemporaneous statements and despite having never raised such concerns during her employment, to avoid her agreement to arbitrate all employment-related claims—under a law that prohibits the arbitration of sexual harassment claims—Respondent has fabricated a legally infirm and patently false theory that Mr. Sieg sexually harassed her.

4. Nothing could be farther from the truth; there is absolutely no factual or legal basis for any such allegation against Mr. Sieg. Respondents own words confirm unequivocally that she was never sexually harassed by Mr. Sieg. She cannot properly or plausibly plead such a claim.

5. Despite agreeing to bring any employment-related disputes against Citi in binding arbitration, Respondent has refused to do so. Instead, on January 26, 2026, Respondent filed a complaint in the U.S. District Court for the Southern District of New York (the "Complaint," "Compl.," or "underlying dispute"), attached hereto as Exhibit A.

6. Petitioners now respectfully petition the Court for an Order, pursuant to Section 4 of the FAA, 9 U.S.C. § 4, to compel Respondent to arbitrate her disputes with Citi.

**PARTIES**

7. Citigroup Global Markets Inc. is a New York corporation with its headquarters in New York, New York.

8. Citigroup Inc. is a Delaware corporation with its headquarters in New York, New York.

9. Respondent Julia Carreon is a former Citi employee and a citizen of Texas.

10. During her employment with Citi, Respondent lived and worked in Austin, Texas.

11. Upon information and belief, Respondent still lives in Austin, Texas.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this petition pursuant to 28 U.S.C. §§ 1331 and 1367. In the underlying dispute, Respondent asserts claims for (1) race discrimination under 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"); and (2) sex discrimination under the NYSHRL and the NYCHRL. Thus, this Court has federal question jurisdiction and supplemental jurisdiction. *See Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009).

13. The Court has personal jurisdiction over Respondent because she resides in, and is a citizen of, Texas. *See Henson Patriot Ltd. Co. v. Medina*, No. 14-cv-534-XR, 2014 WL 4546973, at *2 (W.D. Tex. Sept. 11, 2014) ("This court has personal jurisdiction over the Defendants because they are residents or citizens of Texas.").

14. Venue is proper pursuant to 28 U.S.C. § 1391 and 9 U.S.C. § 4. The FAA permits any "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to "petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If arbitration is ordered, "[t]he hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed." *Id.*

15. The arbitration provisions at issue here specify that arbitration "shall be held in the closest available venue to your current Citi work location (or for former employees, their last Citi work location)." Declaration of Mark Sadloski ("Sadloski Decl.") Ex. A at 11, Ex. D at 4. The Western District of Texas, Austin Division, is the closest venue to Respondent's last work location within Austin, Texas, and thus this Court is the proper venue in which to seek to compel arbitration. Further, federal courts in the Southern District of New York (where Plaintiff filed her Complaint)

have held that the FAA only authorizes courts to compel arbitration within their own district and, thus, the Southern District of New York cannot order the relief requested by Petitioners here. *Merida Cap. Partners III LP v. Fernane*, No. 25-1235, 2025 WL 2531041, at *6 (S.D.N.Y. Sept. 3, 2025) (the Federal Arbitration Act ("FAA") "authorizes courts to compel arbitration only within their own districts.").

## FACTUAL ALLEGATIONS

### *Respondent Joins Citi and Agrees to the Arbitration Policy*

16. For the duration of Respondent's employment at Citi, she lived and worked from her residence in Austin, Texas.

17. As a condition of her employment with Citi, Respondent executed Citi's 2021 Employment Arbitration Policy on August 27, 2021 ("2021 Arbitration Policy"). *See* Sadloski Decl. ¶ 6 & Exs. A–B to Sadloski Decl.

18. Respondent then signed an attestation agreeing to be bound by Citi's 2022 Employment Arbitration Policy ("Arbitration Policy"). *See id.* ¶ 8 & Exs. B–D to Sadloski Decl.

19. The Arbitration Policy "applies to both [Plaintiff] and to Citi, and makes arbitration the required and exclusive forum for the resolution of . . . employment-related disputes . . . between [Plaintiff] and Citi (including Citi's . . . officers, directors, employees and agents)." Sadloski Decl. Ex. A at 8 & Ex. D at 1.

20. The Arbitration Policy specifically requires that Respondent arbitrate "claims, demands or actions under Title VII of the Civil Rights Act of 1964 . . . and any other federal, state or local statute, regulation or common-law doctrine regarding employment, employment discrimination, the terms and conditions of employment, termination of employment, compensation." Sadloski Decl. Ex. A at 9 & Ex. D at 1–2.

21. The Arbitration Policy specifies that arbitration "shall be held in the closest available venue to your current Citi work location (or for former employees, their last Citi work location)." Sadloski Decl. Ex. A at 11 & Ex. D at 4.

22. The Arbitration Policy states that consideration for Respondent's obligations to arbitrate disputes included her "eligibility and consideration for merit increases, incentive and retention awards, equity awards, or the payment of any other compensation to [her], as well as [her] acceptance of employment with Citi, or [her] continued employment with Citi." Sadloski Decl. Ex. A at 8 & Ex. D at 1.

23. The Arbitration Policy also requires Citi to arbitrate any claims it might have against Respondent. Sadloski Decl. Ex. A at 8 & Ex. D at 1.

24. The 2022 Arbitration Policy provides that "[d]isputes which are expressly precluded from arbitration by federal statute also are not covered by this policy." Sadloski Decl. Ex. D at 2. For any such disputes, the Arbitration Policy provides a bifurcation clause:

> If you elect to pursue in court claims that are excluded from this Policy, including claims regarding disputes which are expressly precluded from arbitration by federal statute, Citi may at its option sever any such claims that you file in court from any other claims that you bring against Citi. Citi may choose whether those other claims will be litigated separately in arbitration (if they are covered by this Policy) or whether those other claims will be litigated together with the claims excluded from this Policy that you filed in court.

*Id.*

25. The Arbitration Policy also includes a savings clause that provides: "If any part or provision of this Policy is held to be invalid, illegal or unenforceable, such holding won't affect the legality, validity or enforceability of the remaining parts and each provision of this Policy will be valid, legal and enforceable to the fullest extent permitted by law." *Id.* at 7.

5

*Respondent Enjoys An Excellent Career At Citi Bolstered by Mr. Sieg*

26.  At Citi, Respondent worked on Project Management and Infrastructure for Wealth.

27.  In October 2022, as part of an effort to streamline the Wealth Organization, Respondent began to report to Mr. Valderrabano, Chief Operating Officer for Wealth.

28.  Mr. Valderrabano thought highly of Respondent's performance, rating her as exceeds expectations overall and on each of the individual categories in her performance evaluation in his evaluation of her in 2023.

29.  In January 2024, Respondent was promoted to a new position as Head of Wealth Platforms & Experiences over a slate of both male and female leaders. In Respondent's new role, she was responsible for the overall wealth client experience on Citi's platforms and began to manage a team of approximately 60 employees who were previously supervised by a male leader in Citi's Wealth Tech organization.

30.  Respondent's promotion was supported by Mr. Valderrabano, along with his new manager, Mr. Sieg, who had joined Citi in September 2023 as Head of Wealth.

31.  Respondent was part of a group who met regularly with Mr. Sieg to discuss efforts to improve Citi's Wealth Platforms.

32.  Respondent and Mr. Sieg worked well together professionally as they had previously worked at institutions with similar cultures (Merrill Lynch and Wells Fargo), and they approached problems at work the same way as a result.

33.  Respondent frequently leveraged Mr. Sieg's name and professional reputation in speaking to her supervisor and other direct reports of Mr. Sieg.

34.  For example, Respondent would frequently tell her supervisor, Mr. Valderrabano, that she was close to Mr. Sieg and throw his name around in conversations. As another example,

a female executive, who was a direct report of Mr. Sieg's, raised complaints regarding how Respondent interacted with Mr. Sieg's direct reports, particularly that she came to his off-site and yelled at his direct reports.

35. On May 21, 2024, Respondent was interviewed by Citi's Employee Relations, not because anyone insinuated she had a romantic relationship with Mr. Sieg, but because her female and male colleagues raised complaints about her behavior, including that she implied to other employees that she was very close to Mr. Sieg, such that she could have them terminated and felt comfortable treating the direct reports of Mr. Sieg poorly.

36. Respondent nevertheless reacted completely irrationally to the interview with Employee Relations about the complaints lodged against her regarding her workplace conduct, including repeatedly using profanity in the interview.

37. On May 22, 2024, Respondent wrote to Mr. Valderrabano "I'd like to discuss how I exit citi effective no later than 06/21, please." Respondent's decision to exit Citi was not surprising to Mr. Valderrabano as Respondent had expressed a desire to leave Citi in prior conversations with Mr. Valderrabano and in her year-end self-evaluation five months earlier.

38. Even as Respondent was exiting Citi, she remained steadfast in her praise for Mr. Sieg.

39. On May 27, 2024, Respondent wrote to both Mr. Sieg and Mr. Valderrabano regarding her request to quit and, in doing so, praised Mr. Sieg writing "Andy's leadership is the best thing to happen to this place; rooting for you!"

40. On May 29, 2024, Respondent wrote to Mr. Sieg again stating "thank you for recognizing my talent, for putting me in the room, and for treating me with respect. You are truly one of the most exceptional people & leaders I've ever met. Your integrity is irreproachable. The

kindness you show junior talent is inspirational. And the way you engage in every aspect of the business is incredible. Chris [her husband] & I can't wait to watch the impact you'll have on Citibank. They are so lucky to have you."

41. On May 29, 2024, Respondent wrote to Stephanie Butterworth, her Human Resources leader. Respondent stated she had no interest in suing Citi "bc I would hate to do that to Andy given what an incredible advocate he's been, and I hate to even write this bc it's so obvious: Andy is an advocate bc he knows I'm in the 1% of people on Wall Street who can execute the right way: collaboratively. I wouldn't be successful enough to be on a Times Square billboard if that wasn't true."

42. On June 6, 2024, Respondent wrote to Mr. Sieg and Mr. Valderrabano "Thank you both for attempting to change the culture. It's not easy. Particularly not for change makers. Tmrw is my last day. Appreciate you. Can't wait to watch the great things you'll do."

43. At Respondent's request, June 7, 2024 was Respondent's last day at Citi.

44. Shortly after Respondent left Citi, she announced her next chapter on LinkedIn, stating she "quit Citi to co-found a menopause wellness company to disrupt the tele-health industry" and also emailed Mr. Valderrabano about the "incredible opportunity" she had "to build an amazing company with [her husband's] best friend."

### *Respondent Filed Employment Litigation Despite the Arbitration Policy*

45. Following her voluntary resignation, Respondent repeatedly threatened to file a lawsuit against Petitioners.

46. Citi repeatedly reminded Respondent that her claims must be brought in arbitration pursuant to the Arbitration Policy.

8

47. Respondent nevertheless decided to file the Complaint against Petitioners, in violation of the Arbitration Policy.

### COUNT I: ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT

48. Petitioners incorporate by reference ¶¶ 1 through 48, above.

49. The FAA applies to the Arbitration Policy as a matter of law and as expressly provided in the Arbitration Policy.

50. Petitioners are aggrieved by Respondent's refusal to arbitrate under a written agreement for arbitration and save for the arbitration agreement, the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

51. Section 4 of the FAA, 9 U.S.C. § 4, provides Petitioners a cause of action to compel Respondent to resolve the disputes with Petitioners through arbitration. Section 4 of the FAA, 9 U.S.C. § 4, provides in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

52. The Arbitration Policy constitutes a written agreement that is valid and enforceable under the FAA. Section 2 of the FAA, 9 U.S.C. § 2, provides in relevant part:

> A . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9

53. The Arbitration Policy is a written provision in a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising under the Arbitration Policy.

54. The Arbitration Policy is valid, irrevocable, and enforceable.

55. The Arbitration Policy applies to all claims asserted by Respondent in the threatened litigation, including but not limited to her claims under Section 1981, the NYSHRL, and the NYCHRL.

56. Nevertheless, Respondent has disregarded her contractual obligations to arbitrate by filing litigation in violation of the Arbitration Policy.

57. The Court should enter an Order compelling Respondent to arbitrate all claims raised (or that could be raised) in the Complaint concerning her claims against Petitioners.

58. Petitioners are entitled to enforce the Arbitration Policy under its terms, as well as under applicable law.

WHEREFORE, Petitioners request that the Court order the following relief:

a. An Order, pursuant to Section 4 of the FAA, 9 U.S.C. § 4, compelling Respondent to pursue in arbitration any dispute with Petitioners relating to the claims in the threatened litigation concerning her past employment at Citi;

b. An Order granting Petitioners their attorneys' fees and costs; and

c. Any further relief the Court deems necessary.

| | |
|---|---|
| Dated: January 27, 2026 | /s/ Thomas Cullen Wallace |

T. Cullen Wallace
Texas Bar No. 24072412
Federal Bar No. 1383060
cullen.wallace@morganlewis.com
Nancy L. Patterson
Texas Bar No. 15603520
nancy.patterson@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street
Suite 4000
Houston, TX  77002
Telephone: 713.890.5000
Facsimile: 713.890.5001

Grace E. Speights (*pro hac vice* application forthcoming)
grace.speights@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 739-3000
(202) 739-3001 (Fax)

*Attorney for Petitioners Citigroup Global Markets Inc. and Citigroup Inc.*